IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LeCHRISTIAN STEPTOE,

                              Plaintiff,

                                                Civil Action No.
              v.                                5:09-CV-1132 (NPM/DEP)

THE CITY OF SYRACUSE and
THE GENESEE GRANDE HOTEL,

                    Defendants.

APPEARANCES:

FOR PLAINTIFF:                              OF COUNSEL:

LeCHRISTIAN STEPTOE, *Pro Se*
1108 East Genesee Street
Apt. 302
Syracuse New York 13210

FOR DEFENDANT CITY OF
SYRACUSE:

CITY OF SYRACUSE LAW DEPARTMENT    JOSEPH DOYLE, ESQ.
233 East Washington Street
300 City Hall
Syracuse, NY 13202

FOR DEFENDANT THE GENESEE
GRANDE HOTEL:

COSTELLO, COONEY LAW FIRM          ROBERT CONNOLLY, ESQ.
205 South Salina Street            PAUL FERRARA, ESQ.
4th Floor
Syracuse, NY 13202

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro Se* plaintiff LeChristian Steptoe has commenced this action

against defendants City of Syracuse ("City") and The Genesee Grande

Hotel ("Hotel") pursuant to 42 U.S.C. §1983, alleging that the defendants

deprived him of his civil rights as guaranteed under the Fourth and

Fourteenth Amendments to the United States Constitution, and

additionally asserting pendent state law claims of negligence and

intentional infliction of emotional distress.  Plaintiff's claims stem from an

arrest for criminal trespass based upon his presence on the defendant

Hotel's premises, a charge which was later dismissed by a local court.  As

relief, plaintiff's complaint seeks recovery of $30 million from defendant

City and $20 million from the defendant Hotel.

Although procedurally the case is in its formative stages and no

meaningful pretrial discovery has yet occurred, plaintiff has now moved for

summary judgment in his favor.  While the motion appears to be centered

upon the question of whether the alleged civil rights deprivations were

effectuated under color of state law, in his motion plaintiff claims

entitlement to summary judgment in his favor on all claims as against

defendant Hotel.  Because I find that the motion is premature, and in any event plaintiff has failed to carry his initial burden of demonstrating the lack of any triable issue of material fact relating to his claims against the Hotel, I recommend that his motion be denied.

I.    BACKGROUND[1]

Plaintiff is and was at the relevant times a resident of Syracuse, New York. Amended Complaint  (Dkt. No. 7) ¶ 1.  The Genesee Grande Hotel is a place of public accommodation located in Syracuse, New York, offering hotel, dining, and bar services.  *Id.* at ¶¶ 2, 4-6.  Steptoe has never been an overnight guest at the Hotel.  Ferrara Aff. (Dkt. No. 32) Exhs. M, N.  Plaintiff has, however, eaten in the Hotel's restaurant at various times.  Amended Complaint (Dkt. No. 7) ¶¶ 4-8; Plaintiff's Exhibits (Dkt. No. 22) Exh. 7; Plaintiff's Reply Exhibits (Dkt. No. 40) Exh. 3.

Prior to September 22, 2009, the evening in question, Hotel employees had occasionally seen Steptoe in the Hotel during odd, late-night hours.  One such instance occurred at approximately 3:30 a.m. on a morning when the plaintiff approached Kelly Whitney, a guest services

---

[1]        In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the defendants.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

agent and the night-time auditor working at the facility, seeking information regarding hotel services.  Plaintiff's Exhibits (Dkt. No. 22) Exh. 1.  After a brief conversation, during which Ms. Whitney ascertained that Steptoe was not a guest at the Hotel, plaintiff left.  *Id.*  Plaintiff returned, however, approximately two weeks later at about 1:00 a.m., again asking about hotel services despite not being a guest at the Hotel. *Id.*  On yet another date plaintiff was observed by a different Hotel employee, Joanna Ramsey, as he approached the front desk of the Hotel at approximately 12:30 a.m., yet again inquiring about hotel services.  Plaintiff's Exhibits (Dkt. No. 22) Exh. 1.  On that occasion security was called, and plaintiff was directed to leave the property.  *Id.*  Based upon these incidents plaintiff was advised by both Hotel staff and security not to enter the premises.  Plaintiff's Exhibits (Dkt. No. 22) Exh. 1.

On the evening of September 22, 2009 plaintiff entered the Hotel through a side entrance.  *Id.*  The door through which Steptoe gained access to the facility leads to a dining patio that is enclosed by a metal fence.  *Id.* at Exh. 2; *see also* Plaintiff's Exhibits (Dkt. No. 22) Exh. 13. After observing the plaintiff enter the Hotel and walk through the main level by means of security cameras, Ms. Whitney notified Pam Otis, an

off-duty Syracuse City Police Officer who was working a private security

detail for the Hotel on that evening, of Steptoe's presence.  Plaintiff's

Exhibits (Dkt. No. 22) Exhs. 1, 2.

After entering the Hotel, plaintiff proceeded into the bar area where

the bartender, Sherry MacCombie, was in the process of closing because

of the late hour and lack of customers in the premises.  MacCombie Aff.

(Dkt. No. 53) ¶ 5.[2]  After plaintiff expressed interest in purchasing alcohol

Ms. MacCombie requested identification; in response to that directive,

Steptoe produced a Massachusetts driver's license.  *Id.* at ¶¶ 5-7;

Plaintiff's Exhibits (Dkt. No. 22) Exh. 2.

At that point Ms. Otis entered the bar and, upon questioning, the

plaintiff told her that he was interested in purchasing drinks.  MacCombie

Aff. (Dkt. No. 53) ¶ 7; Plaintiff's Exhibits (Dkt. No. 22) Exh. 2.  Ms. Otis

then advised the plaintiff that if he was there to have a drink he was

welcome to stay, but if not he was trespassing and would have to leave.

---

[2]     An earlier affidavit signed by Sherry MacCombie was filed with the court
in connection with the Hotel's opposition to plaintiff's motion.  *See* Dkt. No. 44.
Because that affidavit contained a typographical error, suggesting that it was signed on
June 17, 2008, rather than June 17, 2010, the affidavit was resubmitted, without
substantive changes, after having been again signed and sworn to on August 26,
2010.  *See* Dkt. Nos. 49, 53.

MacCombie Aff. (Dkt. No. 53) ¶ 8.

After Ms. Otis left the bar area, Steptoe requested a shot of whiskey from bartender MacCombie.  MacCombie Aff. (Dkt. No. 53) ¶ 9.  When informed that it was the Hotel's policy not to sell shots of alcohol, as evidenced by a sign posted above the cash register in the bar area, plaintiff next inquired concerning the price of a beer; upon being advised that it would cost him $4.50 for a beer, Steptoe left without ordering any drinks.  *Id.*  Plaintiff then exited the Hotel, but returned a short time later at approximately 11:45 p.m. on the same evening and approached the front desk, complaining to Ms. Whitney regarding the incident.  Plaintiff's Exhibits (Dkt. No. 22) Exhs. 1, 2.  Ms. Otis was summoned to the lobby area, although by the time she arrived plaintiff had already left the premises.  *Id.* at Exh. 2.  Upon investigating the matter, Officer Otis learned from Joanna Ramsey, another Hotel employee, that she too had seen and spoken with Steptoe concerning his presence on Hotel property on a prior occasion, and that at that time plaintiff was informed by Hotel security personnel to leave and not return to the premises.

Officer Otis filed a report regarding the incident and lodged a violation information with the Syracuse City Court on September 23, 2009

accusing plaintiff of trespass, in violation of New York Penal Law §

140.05.  Plaintiff's Exhibits (Dkt. No. 22) Exhs. 2, 3.  A warrant for

Steptoe's arrest was thereafter sought and obtained.  Amended Complaint

(Dkt. No. 7) ¶¶ 55-56.  Steptoe was subsequently arrested at 9:00 a.m.

on October 2, 2009 by Syracuse Police Officer Nolan, and appeared in

court concerning the matter an hour later, at which time he was released

on his own recognizance.[3]  Plaintiff's Exhibits (Dkt. No. 22) Exh. 6; *see*

*also* Amended Complaint (Dkt. No. 7) ¶ 89.  The charge against plaintiff

was ultimately dismissed by Syracuse City Court Judge Kate Rosenthal

on December 15, 2009.  Plaintiff's Exhibits (Dkt. No. 22) Exh. 8.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on October 8, 2009 and, at the

direction of the court, subsequently filed an amended complaint on

December 21, 2009.  Dkt. Nos. 1, 7.  Named as defendants in plaintiff's

amended complaint are the City of Syracuse and The Genesee Grande

Hotel.  *Id.*  In his complaint, as amended, plaintiff asserts constitutional

---

[3]    The parties' recitations of the chronology of events surrounding plaintiff's arrest and ensuing court appearance are conflicting.  Plaintiff maintains that he was detained for nearly thirty hours before being brought before a judge.  Amended Complaint (Dkt. No. 7) ¶¶ 78, 89.  Plaintiff's version, however, is seemingly contradicted by the arrest report filed by Police Officer Nolan.  Plaintiff's Exhibits (Dkt. No. 22) Exh. 6.

claims under the Fourth Amendment for unlawful seizure of his identification and false arrest, as well as the Fourteenth Amendment for the denial of equal protection and due process, and additionally interposes pendent state law claims of negligence and intentional infliction of emotional distress.  *Id.*  Defendants have since answered, generally denying plaintiff's material allegations and asserting various affirmative defenses.[4]  Dkt. No. 11, 13.

Following joinder of issue, a Rule 16 scheduling conference with the court, and the issuance of a case management scheduling order, but before any significant pretrial discovery had occurred in the case, plaintiff moved on June 2, 2010 for partial summary judgment.  Although the precise scope of the relief sought in his motion is somewhat difficult to discern, it appears that plaintiff's motion is focused upon whether, given the role played by off-duty Syracuse Police Officer Pam Otis in the relevant events, the Hotel can properly be viewed as a state actor for

---

[4]        According to counsel for defendant Hotel, plaintiff served a second amended complaint on June 8, 2010.  Ferrara Aff. (Dkt. No. 32) ¶ 21 and Exh. K. There is no reference to that pleading on the court's docket.  In any event, since that amended complaint was not served with leave of court, as required under Rule 15(a) of the Federal Rules of Civil Procedure, the court has disregarded its purported existence and will treat plaintiff's amended complaint, filed on December 21, 2009, as the currently-operative pleading.  *See* Dkt. No. 7.

8

purposes of his claims under 42 U.S.C. § 1983.  Dkt. No. 22.  The

defendants have since responded in opposition to plaintiff's motion.  Dkt.

Nos. 32-35, 39, 44, 53.  In their opposition papers both defendants argue

that the motion is premature, given that pretrial discovery has not yet fully

occurred.  *Id.*  Additionally, the defendant Hotel argues that in any event

the motion lacks merit.  *Id.*  Plaintiff has since submitted additional reply

papers in answer to the defendants' oppositions.  Dkt. No. 40.

Plaintiff's motion, which is now fully briefed and ripe for

determination, has been referred to me for the issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(b).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Rule 56(f) Objection

In their opposition papers both defendants assert that Steptoe's

summary judgment motion is premature in light of the procedural posture

of the case.  In support of that position defendants note that mandatory

disclosure has not yet been exchanged pursuant to Rule 26(a)(1) of the

Federal Rules of Civil Procedure, nor have they had an opportunity to

serve interrogatories and other discovery demands and take plaintiff's

deposition concerning the relevant events.

While neither defendant makes specific reference to the rule, their

argument is addressed to Rule 56(f) of the Federal Rules of Civil

Procedure.  That rule provides, in pertinent part, that

> [i]f a party opposing the [summary judgment] motion shows by
> affidavit that, for specified reasons, it cannot present facts
> essential to justify its opposition, the court may:
>
> > (1) deny the motion;
> > (2) order a continuance to enable affidavits to be
> > obtained, depositions to be taken, or other discovery to
> > be undertaken; or
> > (3) issue any other just order .

Fed. R. Civ. P. 56(f).  As can be seen from the text of the rule itself, Rule

56(f) provides a narrow exception to the availability of summary judgment

in instances where a party simply cannot fairly respond to a summary

judgment motion because of the inability, through no fault of the opposing

party, to acquire evidence which is available and would preclude the entry

of summary judgment. *See Burlington Coat Factory Warehouse Corp. v.*

*Esprit de Corp.,* 769 F.2d 919, 925-27 (2d Cir. 1985); *Crystalline H$_2$O, Inc.*

*v. Orminski*, 105 F. Supp. 2d 3, 6-9 (N.D.N.Y. 2000) (McAvoy, J.).  In

order to successfully assert a Rule 56(f) defense to a summary judgment

motion a litigant must provide specific indication, in affidavit form, of the

evidence sought, its relevance to the issues underlying the motion, the
efforts that were made to obtain that evidence, and why those efforts have
been unsuccessful.  *Hudson River Sloop Clearwater, Inc. v. Department
of Navy,* 891 F.2d 414, 422 (2d Cir. 1989) (citing *Burlington*, 769 F.2d at
926-27); *Young v. Corbin*, 889 F. Supp. 582, 584-85 (N.D.N.Y. 1995)
(McAvoy, C.J.).

      The opposition papers offered by the City fail to meet the Rule 56(f)
requirements, which are exceedingly rigorous and specific.  The attorney
affidavit submitted on behalf of the defendant Hotel, however, does since
it details the discovery sought, which is uniquely within plaintiff's
knowledge.

      A question remains as to whether the information that has yet to be
developed, including through plaintiff's deposition, is critical to
adjudication of the pending motion.  Most certainly the issue of state
action is dependent upon the inter-relationship between the defendant
Hotel and defendant City and its personnel, including Pam Otis.
Defendants have identified nothing that could be developed through
deposing the plaintiff that would bear upon this issue.

      Although this is less than clear, it appears that plaintiff's motion goes

beyond merely addressing the question of state action, additionally requesting summary judgment on his section 1983 claims against the defendant Hotel.  Those claims are heavily dependent upon critical facts upon which the parties' versions differ markedly.  Accordingly, the court agrees that it would be unfair to adjudicate the merits of plaintiff's claims without first affording defendants a reasonable opportunity to engage in pretrial discovery, including to take plaintiff's deposition.  I therefore recommend that plaintiff's motion be denied as premature under Rule 56(f) of the Federal Rules of Civil Procedure.  *See Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97-98 (2d Cir. 2000).

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

12

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the

13

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith*

*Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party. *See Building*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

C.    Significance of Defendants' Failure To Respond To Plaintiff's
       Local Rule 7.1(a)(3) Statement

Although no reference is made to the rule, plaintiff's summary

judgment motion is supported by a statement of undisputed material facts,

as required under Northern District of New York Local Rule 7.1(a)(3).  In

its opposing papers, the defendant Hotel has failed to respond to

Plaintiff's Local Rule 7.1(a)(3) Statement.

Ordinarily, this failure would result in the facts set forth in plaintiff's

statement being deemed admitted by defendant Hotel, for purposes of the

pending motion, based upon its failure to properly respond to the

statement.  *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL

1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases);

*see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292

(2d Cir. 2000) (discussing district courts' discretion to adopt local rules like

7.1(a)(3)).[5]  In this instance, however, plaintiff himself has also failed to

comply with the requirements of Local Rule 7.1(a)(3), in that his statement

fails to provide citations to the record corresponding to certain of the facts

set forth therein, as required by the rule.  I therefore recommend that

plaintiff's Local Rule 7.1(a)(3) Statement, as well as defendant Hotel's

failure to respond to that statement, be disregarded for purposes of the

pending motion.

D.     Merits of Plaintiff's Motion

As has been noted, plaintiff is somewhat vague when it comes to the

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

relief now sought.  In his motion papers, which are exceedingly prolix,

plaintiff begins by requesting that the affirmative defenses set forth by

both defendants "be denied".  *See* Notice of Motion (Dkt. No. 22) ¶ 1.  In

its closing passages, however, the document denominated as plaintiff's

notice of motion requests partial summary judgment against the defendant

Hotel with regard to his claims asserted under 42 U.S.C. § 1983, alleging

that false statements were made for the purpose of procuring his arrest

and prosecution without probable case.[6]  *Id.*

　　　As a threshold matter, to establish entitlement to summary judgment

on his section 1983 claims arising out of his arrest, plaintiff must show that

based upon the record now before the court, interpreted in a light most

favorable to the defendants, no reasonable factfinder could conclude that

there was probable cause for his arrest.  *See Finigan v. Marshall*, 574

F.3d 57, 61, 62 (2d Cir. 2009) (granting summary judgment in favor of the

defendant in a section 1983 action based upon a finding of probable

cause).  As was previously noted, plaintiff was charged

criminally with trespass, in violation of New York Penal Law § 140.05.

_____

[6]　　　That summary judgment is sought only against defendant Hotel is confirmed by plaintiff's reply, in which he argues that the City lacks standing to oppose the motion.  Plaintiff's Reply Aff. (Dkt. No. 40) ¶¶ 216-25.

That section provides that "[a] person is guilty of trespassing when he [or she] knowingly enters or remains unlawfully in or upon premises."  N. Y. Penal Law § 140.05.  A violation of this statute occurs when a person has been asked to leave and not return to a premises, including a place of public accommodation such as a hotel, and nonetheless enters or remains upon premises in defiance of such a directive and without permission.  *People v. Bembry*, 128 Misc. 2d 243, 490 N.Y.S.2d 431 (Utica City Ct. 1985).

In this instance the record before the court, when viewed in light most favorable to the defendants, reflects that plaintiff was advised on more than one occasion by Hotel employees and security staff not to return to the premises if he was not there to make a purchase, and that directive was reiterated by Pam Otis on the evening of September 22, 2009.  Despite those instructions, after initially exiting the premises, plaintiff returned to the Hotel on that evening in defiance of the order not to do so.  Accordingly, plaintiff is unable to establish a lack of probable cause for his arrest for criminal trespass in violation of Penal Law § 140.05.

In addition to being unable to show, as a matter of law, that his

17

arrest and prosecution was without probable cause, plaintiff similarly cannot establish no reasonable factfinder could conclude that defendant Hotel was not acting under color of state law at the relevant times. Section 1983 provides a right of action against a party "who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, or immunities secured by the Constitution and Laws . . .."   42 U.S.C. § 1983.  One of the essential elements of a claim under that section is that the conduct complained of was committed by a person acting under color of state law.  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994); *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 407-408 (S.D.N.Y. 2009).

    To establish liability under section 1983, a plaintiff must prove unlawful conduct which is "fairly attributable to the state."  *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S. Ct. 2744 (1982); *Dyno v. Binghamton,* No. 3:09-CV-313 (TJM/DEP), 2009 WL 1663990, * 8 (N.D.N.Y. June 15, 2009) (McAvoy, S.D.J.).  Actions of a private entity such as the Hotel can be deemed fairly attributable to the state when:

> (1) the entity acts pursuant to the "coercive power"
> of the state or is "controlled" by the state ("the

> compulsion test"); (2) when the state provides
> "significant encouragement" to the entity, the entity
> is a "willful participant in joint activity with the
> [s]tate", or the entity's functions are "entwined" with
> state policies ("the joint action test" or "close nexus
> test"); or (3) when the entity "has been delegated a
> public function by the [s]tate", ("the public function
> test").

*Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255,

257 (2d Cir. 2008) (citing and quoting *Brentwood Acad. v. Tenn.*

*Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296, 121 S. Ct. 924 (2001))

(citations and internal quotation marks omitted); *see also Hollander v.*

*Copacabana Nightclub,* No. 08-5547-CV, 2010 WL 3419954, * 3 (2d Cir.

Sept. 1, 2010); *Fabrikant v. French*, No. 1:03-CV-1289 (DNH-DRH), 2010

WL 2774043, at *5 (N.D.N.Y. July 13, 2010) (Hurd, D.J.).

In this case, the plaintiff appears to suggest application of the "joint

action test", asserting that the defendant Hotel and a state official, in this

case Pam Otis, shared a common unlawful goal, agreeing to act together

jointly to deprive him of rights guaranteed by federal law.[7]  The facts

---

[7]     For purposes only of plaintiff's pending motion, the court has assumed that Pam Otis, an off-duty Syracuse City Police Officer, could properly be regarded as a state official.  It is not altogether clear that in the end this finding will be made.  The courts have frequently been called upon to determine whether off-duty police officers can properly be regarded as state actors for purposes of section 1983.  *See, e.g., Pitchell*, 13 F.3d at 548; *Claudio,* 675 F. Supp. 2d at 408-409; *Dean v. City of Buffalo*, 579 F. Supp. 2d 391, 404-405 (W.D.N.Y. 2008).  Because Officer Otis is not a defendant in this action, and in any event plaintiff's motion is focused upon whether

surrounding the interactions between employees of the defendant Hotel and public officials, including officers with the Syracuse Police Department, are far from crystalized.  It is true that representatives of the Hotel requested that plaintiff be prosecuted for trespass.  This alone, however, does not constitute sufficient joint action between representatives of the Hotel, as a private entity, and public police officials to support a finding of liability under section 1983.  *Cf. Parker v. Grand Hyatt Hotel,* 124 F. Supp.2d 79, 88 (D.D.C. 2000); *Bang v. Utopia Restaurant,* 923 F. Supp. 46, 49 (S.D.N.Y. 1996).

Of course, if the relationship between the Hotel and the police went further a reasonable factfinder could, at trial, find that there was sufficient participation by the Hotel in joint activity with the state such that one could conclude that the Hotel was acting under color of state law.  On the scant record now before the court, however, and without the benefit of pretrial discovery, the court is unable to say, as a matter of law, that no reasonable factfinder could conclude otherwise.  All that is now before the

---

the defendant Hotel can be fairly characterized as a state actor, it is unnecessary to resolve the more complex issue of determining whether Pam Otis was acting in her official capacity at the relevant times.  Of course, if Officer Otis was found to have been acting under color of state law at the relevant times, then defendant City could potentially be exposed to liability under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978).  *See Claudio*, 675 F. Supp. 2d at 408-409.

court regarding this issue are plaintiff's bare, conclusory allegations that the Hotel and its employees instructed Pam Otis and other Syracuse Police Officers to violate his constitutional rights.  *See, e.g.* Plaintiff's Notice of Motion (Dkt. No. 22) ¶¶ 57-58.  Again, interpreted in a light most favorable to the defendants, all that can be said with certainty is that Hotel employee Kelly Whitney provided a statement to police officers regarding plaintiff's actions and requested that he be prosecuted for trespassing. This act alone is insufficient to establish an agreement to violate plaintiff's constitutional rights and convert purely private actions of a hotel employee into state action.  *Bang*, 923 F. Supp. at 49 ("Calling the police, alone, does not establish joint action . . ..") (citing *Newman v. Bloomingdale's*, 543 F. Supp. 1029, 1032 (S.D.N.Y. 1982)).

From the foregoing, it is clear that plaintiff has failed to establish the lack of any disputed facts surrounding his claim that defendant Hotel is a state actor, and that no reasonable factfinder could conclude that Hotel and state officials did not reach an agreement or understanding to deprive the plaintiff of his constitutional rights.[8]   Accordingly, plaintiff's motion

---

[8]        Plaintiff devotes a significant portion of his motion papers to the claim that by working as a part-time security guard for defendant Hotel while in the employ of the Syracuse City Police Department, Pam Otis has violated state laws and regulations.  *See, e.g.,* Notice of Motion (Dkt. No. 22) ¶¶ 60-75.  As plaintiff appears to

should be denied.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff, who bears the burden of establishing that the defendant Hotel acted under color of state law for purposes of his claims against that entity under 42 U.S.C. § 1983, and that no triable issues of material fact exist regarding this question, seeks the entry of summary judgment arguing that no reasonable factfinder could conclude that the Hotel was not engaged in joint activity with the state and therefore could fairly be said to be a state actor.  Because plaintiff's motion is premature, having been made before the defendants have had a fair opportunity to engage in pretrial discovery, it should be denied on this procedural basis.  In any event, plaintiff has failed to carry his initial burden of demonstrating to the court's satisfaction the lack of any genuinely disputed issues of fact surrounding the questions of state action, as well as whether there was probable cause to believe that plaintiff committed trespass in violation of New York Penal Law § 140.05.  It is therefore hereby respectfully

RECOMMENDED that plaintiff's motion for partial summary

---

recognize in his reply papers, *see* Plaintiff's Reply (Dkt. No. 42) ¶ 3, his allegations regarding the alleged impropriety of Officer Otis accepting outside employment with a private security detail are not relevant to the issue of whether the defendant Hotel is properly considered to have been a state actor at the relevant times.

judgment (Dkt. No. 22) be DENIED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:      September 5, 2010
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

23



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

   FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

*5 The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See*Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation.*"*Id.* (Emphasis supplied). *Accord*, *Davis*, 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser*, 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See*, *Reese v. Jefferson Sch. Dist.*, 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.*, 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.*, 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See*, *Reese*, 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis*, the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See*, *Murray*, 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See*, *Murray*, 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Thomas Lamont DYNO, Plaintiff,
v.
Suny BINGHAMTON, Whrw FM Radio, Defendants.
**No. 3:09-CV-313 (TJM-DEP).**

June 15, 2009.

West KeySummary
**Civil Rights 78 &#9755;    1326(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(6) k. Schools; Education. Most Cited Cases

**Civil Rights 78 &#9755;    1326(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(7) k. Public Support, License, or Regulation; Utilities and Monopolies. Most Cited Cases
Disc jockey did not allege sufficient facts to establish that private radio station acted under color of state law with respect to disc jockey privileges such as to implicate § 1983. Radio station was a community radio station located on a state university campus. Disc jockey was suspended from radio station for repeatedly violating its "no profanity" rules. Disc jockey argued that the radio station was a state actor under the joint action test because university created, funded, and held the license for the radio station. However, disc jockey did not present any

evidence that university or its administrators had any involvement in the creation or enforcement of the station's policies. Further, disc jockey did not provide any evidence that the university or its administrators played any role in disc jockey's suspension. 42 U.S.C.A. § 1983.

Thomas Lamont Dyno, Johnson City, NY, pro se.

Krista A. Rock, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff commenced this action *pro se* pursuant to 42 U.S.C. § 1983 alleging that the suspension and subsequent revocation of his disc jockey privileges at radio station WHRW FM (the "Station"), located on the campus of Binghamton University of the State University of New York ("BU"), violated his First and Fourteenth Amendment rights. *See* Compl., dkt. # 1. Plaintiff sues the Station and BU seeking injunctive and declaratory relief as well as monetary damages. *See id.*

BU moves pursuant to Fed.R.Civ.P. 12(b)(1) & (6) to dismiss the Complaint on the grounds that: 1) the claims against BU are barred by the Eleventh Amendment; and 2) the allegations against BU fail to state a claim upon which relief can be granted. *See* BU's Mot. to Dismiss, dkt. # 7. Plaintiff opposes the motion. *See* Plf. Opp., dkt. # 8.

Plaintiff also moves for a preliminary injunction requiring that his disc jockey privileges be reinstated and enjoining Defendants from enforcing the Station's policy that prohibits the use of on-air language considered obscene or profane by the Station. Pl. Emergency Motion, dkt. # 18. BU opposes the preliminary injunction, *see* BU's Resp. in

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

Opp. [dkt. # 20], and Plaintiff has replied to BU's opposition. *See* Pl.'s Reply [dkt. # 23]. The Station has not appeared in this action and the Clerk of the Court entered default against this Defendant on May 7, 2009. *See* Clerk's Entry of Default, dkt. # 13.

## II. STANDARDS OF REVIEW

### a. *FED. R. CIV. P. 12(b)(1)*

A case is to be dismissed for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *See Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir.2002); *see also Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996). When a defendant moves to dismiss claims pursuant to Fed.R.Civ.P. 12(b) (1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Medical Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993). For purposes of such a motion, "the allegations in the complaint are not controlling ... and only uncontroverted factual allegations are accepted as true." *Id.* Both the movant and the pleader are permitted to use affidavits and other pleading materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction. *See Makarova,* 201 F.3d at 113; *Filetech S.A. v. France Telecom, S.A.,* 157 F.3d 922, 932 (2d Cir.1998); *John Street Leasehold, LLC v. Capital Mgt. Res., L.P.,* 2001 WL 310629, at *2 (S.D.N.Y. March 29, 2001). "Thus, the standard used to evaluate a Rule 12(b)(1) motion is similar to that used for summary judgment under Fed.R.Civ.P. 56." *Lopresti v. Merson,* 2001 WL 1132051, at *5 (S.D.N.Y. Sept.21, 2001).

### b. *FED. R. CIV. P. 12(b)(6)*

**\*2** A motion under FED. R. CIV. P. 12(b)(6) tests the legal sufficiency of the claims pleaded in the case. The Supreme Court recently elaborated on the standard to be used in addressing a Rule 12(b)(6) motion and again explained Rule 12(b)(6)'s interrelationship with the federal

pleading standard under FED. R. CIV. P. 8. *See Ashcroft v. Iqbal,* ---U.S. ----, ---- - ----, 129 S.Ct. 1937, 1949-50, --- L.Ed.2d ----, ---- - ---- (2009). In this regard, the Court explained:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [ *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

*Ashcroft,* 129 S.Ct. at 1949.

To withstand a Rule 12(b)(6) motion the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 557). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully," and a complaint that pleads facts "that are 'merely consistent with' a defendant's liability [ ] 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557).

While the Rule 12(b)(6) standard has long required that a court accept as true the allegations contained in a complaint, this rule does not apply to legal conclusions or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (citing *Twombly,* 550 U.S. at 555). The liberality accorded

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

pleadings under Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.,* at 1950 (citing *Twombly,* 550 U.S. at 556).

In deciding a Rule 12(b)(6) motion, review "is generally limited to the facts and allegations that are contained in the [challenged pleading] and in any documents that are either incorporated into the [pleading] by reference or attached to the [pleading] as exhibits." *Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (citations omitted). Dismissal is appropriate where the pleading fails as a matter of law to state a claim upon which relief can be granted. *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002).

### c. Preliminary Injunction

**\*3** A preliminary injunction is an extraordinary measure that should not be routinely granted. *Twentieth Century Fox Film Corp. v. Marvel Enterp., Inc.,* 277 F.3d 253, 258 (2d Cir.2002). It has been said that it is "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. As the Second Circuit noted in *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), the movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Id., at 77.* Where, however, a movant seeks relief which will alter, rather than maintain, the status quo, or which will provide him with substantially all the relief sought, the injunction sought is properly characterized as mandatory rather than prohibitory. A party seeking a mandatory injunction must make a "clear" or "substantial" showing of the likelihood of success, as well as irreparable harm should the injunction not be granted. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996), *cert. denied,* 525 U .S. 824 (1998); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995) ("[A] mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will

result from a denial of preliminary relief.") (internal quotation omitted). While a factual hearing is generally required on an application for a preliminary injunction, no hearing is required where material issues are not in dispute. *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations,* 107 F.3d 979, 984 (2d Cir.1997).

### III. BACKGROUND

The following facts are taken from the Complaint and the exhibits attached thereto, or from uncontradicted facts presented in the affidavits submitted in this matter.

WHRW FM (the "Station") is an educational and community radio station located on the campus of Binghamton University of the State University of New York ("BU"). Hagerbaumer Aff., ¶ 3. It operates under a Federal Communications Commission ("FCC") license as a non-commercial, educational FM radio station. *Id.* The Station is a student-run organization that is chartered and funded by the Student Association at BU. *Id.* BU's "involvement with WHRW is limited to issues of the license and Federal Communication ("FCC") controls and guidelines." Compl. Ex. 1 (10/27/05 Ltr. from BU President Lois B. DeFleur). The BU administration has no role in determining content or structure of the Station's programming or enforcement of Station policy. Compl. Ex. 1; Hagerbaumer Aff., at ¶ 4. All Station programming, including creation of the broadcast schedule, is decided by the Station's Board of Directors and Program Director. Hagerbaumer Aff. ¶ 5; Compl. Ex. 1. The Station Manager is responsible for the oversight and implementation of all Station policies and procedures, including those relating to staffing and broadcasting privileges. Hagerbaumer Aff., at ¶ 5.

**\*4** The Station allows students and non-student community members and groups to have on-air shows. Compl. Ex. 1. Plaintiff was a volunteer disc jockey at the Station and had his own on-air show. Compl. Ex. 2.

The Station has a policy that prohibits its disc jockeys from, at all times, using words, phrases, or materials that the Station's managers consider obscene or profane. Compl, Ex. 8. In this regard, the Station's policy provides:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

The FCC's definition of obscenity is material which is in the prurient interest, sexual in nature and lacking scientific, literary, artistic or political value. WHRW follows the FCC definition.

The WHRW definition of profanity is words or material that can be interpreted [as] [FN1] profane or vulgar. Examples of profane language include: swearing, expletives and obscene language.

> FN1. The text uses the word "or" instead of "as" which, for obvious reasons, appears to be a typographical error.

A 24 hour ban on obscenities and profanity is in effect at WHRW. The following are examples of obscene and profane material: "Fuck", "Motherfucker", "Shit", and other words, phrases or material that fit the two definitions as defined by the FCC, the WHRW Program Director or the WHRW General Manager. *Id.*

At about 4 a.m. on March 5, 2006, while Plaintiff was on the air, he allegedly played the phrase: "you're not worth shitting on." Compl. ¶¶ 6, 18 & Ex. 2. [FN2] On March 9, 2006, the Station's Program Director wrote to Plaintiff indicating that it had been brought to her attention that Plaintiff played this phrase and advised him that "[t]his is against WHRW policy and therefore, absolutely cannot be played EVER." Compl. Ex. 2 (emphasis in original). She further advised: "I consider this a warning. However, if this happens again, I will be forced to cancel your show." *Id.*

> FN2. Plaintiff does not deny that he played this phrase while on the air and has contended throughout this matter that his speech on this, and another date, was protected under the First Amendment. *See e.g.* Compl. Ex. 7 (March 27, 2006 letter from Plaintiff to Lois B. DeFluer, President of SUNY Binghamton, complaining that his "broadcasting privileges" were "arbitrarily revoked" for "airing protected

speech.").

On March 18, 2006, the Station's General Manager sent Plaintiff a letter indicating:

> During your show from 10pm [*sic* ] March 11th to 2 AM [*sic* ] March 12th, you deliberately played material containing words you knew to be contrary to WHRW's rules and regulations. You also failed to log a station ID from the hours of 2200 and 0100 as well as failed to log a sign-off cart. As a cleared DJ who has taken and passed the WHRW clearance exam, you know that the FCC requires WHRW to air station ID within 5 minutes of each hour and also requires that the information in the sign-off cart be played before broadcast ends.
>
> As of this moment, your clearance has been suspended pending a board meeting at 7pm on Thursday[,] March 23rd 2006 in room WB08 (next door to the station). At this meeting you be able to speak on your behalf and the future of your clearance at WHRW will be discussed.

Compl. Ex. 3; *see also* Compl. ¶¶ 6, 18.[FN3]

> FN3. Again, Plaintiff does not deny that he played material that was in violation of the Station's policy. He also does not deny that he failed to log a station ID at the times asserted.

On March 24, 2006, the Program Director wrote in a letter to Plaintiff:

> After two separate incidents involving WHRW rules violations and a board meeting to hear your defense, it has been the decision of the WHRW board to suspend your clearance, starting immediately, and lasting until Summer 2007. At this point, you will have to re[-]apprentice and take the clearance exam in order to regain your status as a WHRW member and engineer.

**\*5** Compl. Ex. 4.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

Plaintiff returned to the Station on June 23, 2007 and served as an apprentice for one broadcast show. Thereafter, however, Plaintiff refused to sign an agreement to abide by the Station's policy and he was banned "indefinitely" from broadcasting as a disc jockey at the Station. Compl. ¶ 7 & Ex. 9.

Plaintiff commenced this action on March 18, 2008. He sues both the Station and BU pursuant to 42 U.S.C. § 1983. Plaintiff's primary contention is that the Station's policy imposing a 24-hour ban on material the Station's managers consider to be profane or obscene, which Plaintiff contends is more restrictive than, and at odds with, FCC regulations banning such material only at certain hours, infringes his First Amendment right to free speech. *See e.g.* Compl. ¶ 9 ("the suspension of [Plaintiff's broadcasting] privilege was an infringement [of his First Amendment rights] and on a ground contrary to express FCC policy."); ¶ 10 (the Station's policy placing a 24-hour ban on obscenity and profanity is contrary to FCC regulations that allow such speech "within the safe harbor zone"); ¶¶ 20-23 (asserting that the Station's policy was more restrictive than the FCC regulations). Plaintiff seeks monetary damages, a declaration that the Station's policy is unconstitutional, and an injunction restoring his broadcast privileges and preventing the Station from enforcing its policy in the future.

**IV. DISCUSSION**

*a. Eleventh Amendment Immunity*

BU argues that the action against it, a state agency, is barred by the Eleventh Amendment. Plaintiff argues that the exception to Eleventh Amendment immunity enunciated in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies to that portion of the action seeking prospective equitable relief.

The Eleventh Amendment serves as a jurisdictional bar to suits against a state agency regardless of the nature of the relief sought, including suits in equity. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Green v. Mansour*, 474 U.S. 64, 72-73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *see*

*also Dube v. State University of New York*, 900 F.2d 587, 594 (2d Cir.1990) ("For Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party.") (internal quotation marks omitted) (alterations in original). However, a narrow exception to this principle allows a federal court to issue an injunction against a state official in his or her official capacity who is acting contrary to federal law. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see Pennhurst*, 465 U.S. at 102; *New York Health and Hospitals Corporation et al. v. Perales*, 50 F.3d 129 (2d Cir.1995). This exception is a limited one, and is authorized to "vindicate the supremacy of [federal] law." *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir.2000). Under *Ex parte Young*, "a plaintiff may sue a state official acting in his official capacity-notwithstanding the Eleventh Amendment-for prospective, injunctive relief from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617(2d Cir.2007) (internal quotation marks omitted). "Such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities." *Ghent v. Moore*, 519 F.Supp.2d 328, 334 (W.D.N.Y.2007) (citing *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 32 (2d Cir.1991) ("a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly, even though in reality the suit is against the state"); *Banks v. SUNY*, 2007 WL 895505, at *7 (W.D.N.Y. Mar.22, 2007) ("A state *official* ... may be sued in his official capacity in a federal forum to enjoin conduct that violates the federal Constitution"); *Dicks v. Binding Together, Inc.*, 2007 WL 1462217, at *5 (S.D.N.Y. May 18, 2007) ("Plaintiff's claims for prospective injunctive relief are not barred by the Eleventh Amendment-provided, however, that Plaintiff brings those claims against a state official, rather than the state itself.").

**\*6** Plaintiff has not sued a state official acting in his or her individual or official capacity. Accordingly, the exception to Eleventh Amendment immunity enunciated in *Ex parte Young* is inapplicable. The claims against BU must be dismissed.

*b. Rule 12(b)(6)*

Assuming *arguendo* that Plaintiff intended to bring an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

official capacity suit against a BU official, such as President DeFleur, he fails to assert a plausible claim of either a First or Fourteenth Amendment violation against such a defendant.

**1. First Amendment**

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. It has "long been established that 'the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech,' and that [the First Amendment's] provisions therefore apply to state governments." *Lusk v. Village of Cold Spring,* 475 F.3d 480, 485 (2d Cir.2007) (quoting *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)). "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Meyer v. Grant,* 486 U.S. 414, 421, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)).

Assuming without deciding that the Station operated as a limited public forum in which the government may make only reasonable, viewpoint-neutral rules governing the content of speech allowed therein, *see Husain v. Springer,* 494 F.3d 108,121-22 (2d Cir.2007),[FN4] Plaintiff has failed to allege that there existed any BU policy concerning the operation of the Station, or that any BU official took any affirmative action to curtail the content of Plaintiff's speech.[FN5] Rather, the allegations in the Complaint and the exhibits attached thereto indicate that BU administrators had no role in operating the Station, in determining the content or structure of the Station's programing, or in enforcing the Station's policies. *See* Compl. and Exs. 1-4, 6, 8-9. Although BU is involved with the Station on "issues of the license and [FCC] controls and guidelines," Compl. Ex. 1, Plaintiff's grievance is with the Station's policy which, he contends, is more restrictive than, and at odds with, the FCC's regulations on the use of obscenities and profanity. *See e.g.* Compl. ¶¶ 9, 10, 20-23. Thus, even construing the allegations in the *pro se* Complaint to raise the strongest argument they suggest, *see Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), Plaintiff fails to allege a plausible claim against a state

official because he fails to allege facts supporting the causation element of his First Amendment claim. *See* Brown v. Sheridan, 894 F.Supp. 66, 71 (N.D.N.Y.1995) ("To prevail on his claim under Title 42, section 1983, plaintiff must show that officials were 1) acting under color of state law, 2) that their actions deprived plaintiff of a right guaranteed by the constitution or the laws of the United States, and 3) that the defendants' acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff.") (internal citations omitted). Simply stated, he fails to allege facts supporting the contention that a State official caused his asserted-First Amendment injury. Blyden v. Mancusi, 186 F.3d 252, 267 (2d Cir.1999) ("Liability under Section 1983 is only for those deprivations of rights caused by the defendant's behavior.").[FN6] Thus, even if not barred by the Eleventh Amendment, Plaintiff fails to plead a plausible First Amendment claim against a BU official.

> FN4. In *Husain,* the Second Circuit wrote:
>
> Courts have long recognized that student media outlets at public universities, and the student journalists who produce those outlets, are entitled to strong First Amendment protection. These rights stem from courts' recognition that such student media outlets generally operate as "limited public fora," within which schools may not disfavor speech on the basis of viewpoint.
>
> A limited public forum is "is created when the State 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.' ... In limited public fora, the government may make reasonable, viewpoint-neutral rules governing the content of speech allowed." *Peck v. Baldwinsville Cent. Sch. Dist.,* 426 F.3d 617, 626 (2d Cir.2005) (emphasis and internal citations omitted). Once the state has created a limited public forum, however, it must respect the boundaries that it has set. It may not "exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (internal citations and quotation marks omitted). The forum itself can take many forms, yet the analysis of the constitutionality of restrictions imposed on speech made in the forum remains the same. *See id.* at 830, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 ("The [student activity fund] is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable.")

494 F.3d at 121-22.

FN5. Plaintiff has not alleged that he expressed any viewpoint that BU administrators or the Station's managers sought to curtail.

FN6. Plaintiff argues in his Memorandum of Law that President DeFleur was aware of the unconstitutional practice at the Station yet failed to intervene to stop it. In support of this proposition, he cites to DeFleur's October 27, 2005 letter which is attached to the Complaint as Exhibit A. However, Plaintiff has not sued President DeFleur in either her official or individual capacity, and he has not provided any factual allegations explaining what prompted DeFleur's October 27, 2005 letter. It would be sheer speculation to conclude that the letter was in response to a complaint about the Station's obscenity and profanity policy. While Plaintiff does allege in the Complaint that he complained to DeFleur of the Station's allegedly unconstitutional policy, the complaint was made after he was suspended and, therefore, could not have been the basis of DeFleur's October 27, 2005 letter. *See* Compl. ¶ 24 & Ex. 7 (Pl.'s 03/27/06 letter to DeFleur).

**2. Fourteenth Amendment**

**\*7** Again construing Plaintiff's *pro se* Complaint to raise the strongest argument it suggests, he may also be

contending that (1) he had a protected property right in his broadcast privileges, and/or, (2) he had a protected liberty interest in his good reputation, both of which were deprived in violation of his Fourteenth Amendment right to due process. *See* Compl. ¶ 17 ("My privilege to broadcast under the FCC license is a privilege and property right conferred by the State and protected under the U.S. Constitution, which *inter alia* cannot be revoked or suspended in terms of 1st Amendment rights under the U.S. Const. without compelling interest."); *id.* ¶ 30 ("Plaintiff's basis for damages is (a) the stigma of being seen in the Press and in the Public eye as a person who repeatedly broadcast obscene material when in actuality Plaintiff was being wrongfully and arbitrarily punished for allegedly broadcasting material which under the Constitution and law is protected speech."). Nevertheless, Plaintiff fails to allege sufficient facts to support a legally plausible claim under either theory.

In order to formulate a claim under the Fourteenth Amendment's Due Process Clause, [Plaintiff] must demonstrate that he possesses a constitutionally protected liberty or property interest, and that state action has deprived him of that interest. *See* U.S. Const. amend. XIV, § 1; *see also, e.g., Bd. of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."). Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citation omitted).

*Storman v. Klein,* 2009 WL 1035964, at \* 11 (S.D.N.Y. April 20, 2009) (footnotes omitted).

The facts alleged in the Complaint fail to demonstrate that Plaintiff had a protected property interest in his voluntary disc jockey privileges at the Station. Rather, the allegations in the Complaint demonstrate that Plaintiff had a unilateral expectation of, or desire for, the "privilege" to serve as a voluntary disc jockey, and that he did so at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

discretion of the Station's management and Board of Directors. There is no allegation that Plaintiff had a contract for the position or that state law somehow entitled him to the position. Without factual recitals supporting the existence of a protected property interest in the broadcast privileges at the Station, the claim is legally implausible. *See Bd. of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."); *Velez v. Levy,* 401 F.3d 75, 85 (2d Cir.2005) ("[O]nly where a plaintiff can demonstrate that state law confers 'a legitimate claim of entitlement' to a particular position will a property interest in that position arise."); *Storman,* 2009 WL 1035964, at *12 ("A plaintiff must establish that his contract or functional equivalent confers the benefit as 'virtually a matter of right.' ") (quoting *Schwartz v. Thompson,* 497 F.2d 430, 433 (2d Cir.1974)); *see also Arteta v. County of Orange,* 141 Fed. Appx. 3, 6 (2d Cir.2005) ("When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest."). Hence, any Fourteenth Amendment claim brought on this basis must be dismissed.[FN7]

> **FN7.** It is also worth noting that the Station afforded Plaintiff notice of the Board meeting where the "future" of a broadcast privileges would be addressed, and afforded him an opportunity to present his defense to the Board. Thus, it would seem that the Station afforded Plaintiff constitutionally adequate due process before it suspended him from serving as a disc jockey. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' ") (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950)); *Calhoun v. N.Y. State Div. of Parole Officers,* 999 F.2d 647, 653 (2d Cir.1993) ("Due process requires, as a general matter, 'an opportunity to be heard' 'at a meaningful time and in a

meaningful manner.' ") (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)).

**\*8** To the extent that the Complaint alleges a denial of a Fourteenth Amendment liberty interest based upon purported damage to Plaintiff's reputation, the claim fails because Plaintiff has not alleged sufficient facts to satisfy the "stigma" element of the claim. *See Storman,* 2009 WL 1035964, at * 13-*15. Assuming the Station publicized a statement that Plaintiff was banned for playing profane material on two occasions and for refusing to sign an agreement to abide by the Station's policy, the statement reflects conduct that was within Plaintiff's power to correct, which did not reflect dishonesty or immorality, and which Plaintiff has not asserted was false. Thus, the claim fails to assert a plausible claim of the deprivation of a constitutionally protected liberty interest. *See id.* at *14 ("[S]tatement[s] that an employee poorly performed her duties or acted in an improper manner, or that describe behavior or actions that are within the employee's power to correct, do not generally qualify as stigma for constitutional purposes.") (interior quotation marks and citations omitted); *Schlesinger v. N.Y. City Transit Auth.,* 2001 WL 62868, at *7 (S.D.N.Y. Jan.24, 2001) ("The defamatory statements accused plaintiff only of acting in an unprofessional manner. Furthermore, the charges against plaintiff did not reflect dishonesty or immorality, which may be beyond plaintiff's power to correct. Rather, the charges primarily concerned one incident where plaintiff acted in a disrespectful manner. Because such conduct is within his power to correct, the charge is not sufficiently stigmatizing."); *Storman,* 2009 WL 1035964, at * 15 ("[Plaintiff] also must assert that the stigmatizing statements are false, and prove the stigmatizing statements were publicized.") (citations omitted). Accordingly, any Fourteenth Amendment due process claim based upon a purported denial of a liberty interest must be dismissed.

**c. Preliminary Injunction**

Turning to the sought-after preliminary injunction against the Station, it is apparent that Plaintiff seeks relief which will alter, rather than maintain, the status quo. Thus, Plaintiff must make a "clear" or "substantial" showing of the likelihood of success on his Section 1983 claims.[FN8] In addressing the merits of Plaintiff's claims, the initial

Page 9

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

question is whether he has alleged sufficient facts to establish that the Station, a nominally private entity, acted under color of state law with respect to Plaintiff's disc jockey privileges such to implicate Section 1983. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155-57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (Under § 1983, a plaintiff must prove that a defendant deprived him of a constitutional or federal statutory right while acting under the color of law.). The Court finds that he has not.

> FN8. Because Plaintiff asserts a loss of his First Amendment right to free speech, the dispute on the preliminary injunction motion is whether Plaintiff can satisfy the second prong on the preliminary injunction standard. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury."); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) ("[W]hen an alleged deprivation of a constitutional right is involved, ... no further showing of irreparable injury is necessary.").

The Supreme Court has held that, to implicate 42 U.S.C. § 1983, conduct must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see also Brentwood Academy v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 306, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001).[FN9]

> FN9. The Supreme Court wrote in *Brentwood Academy:*
>
> > Like the state-action requirement of the Fourteenth Amendment, the state-action element of 42 U.S.C. § 1983 excludes from its coverage merely private conduct, however discriminatory or wrongful. Careful adherence to the 'state action' requirement thus preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. The state-action doctrine also promotes important values of federalism, avoiding the imposition of responsibility on a State for conduct it could not control. Although we have

used many different tests to identify state action, they all have a common purpose. Our goal in every case is to determine whether an action can fairly be attributed to the State.

> 531 U.S. at 306 (internal citations and quotation marks omitted).

*9 For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test"). *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citations and internal quotation marks omitted). *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257-58 (2d Cir.2008).

Plaintiff argues that the Station is a state actor under the joint action test because BU created, funded, and held the FCC license for the Station and, thus, BU was entwined with the Station.

It is not enough, however, for a plaintiff to plead state involvement in *"some activity* of the institution alleged to have inflicted injury upon a plaintiff"; rather, the plaintiff must allege that the state was involved "with *the activity that caused the injury"* giving rise to the action. *Schlein v. Milford Hospital, Inc.,* 561 F.2d 427, 428 (2d Cir.1977) (internal quotation marks and citation omitted) (emphases added); *see also United States v. Int'l Bhd. of Teamsters,* 941 F.2d 1292, 1296 (2d Cir.1991) ("The question is not whether the decision to establish the [private entity] was state action, but rather whether the [private entity]'s decision to sanction [plaintiffs] may be 'fairly attributable' to the [g]overnment." (quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982))).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1663990 (N.D.N.Y.)
(Cite as: 2009 WL 1663990 (N.D.N.Y.))

*Sybalski*, 546 F.3d at 257-58 (emphasis in *Sybalski* ).

Plaintiff has not alleged sufficient facts to demonstrate that BU or any of its administrators had any involvement in the creation or enforcement of the Station's policies, and there are no factual allegations that BU or its administrators played any role in Plaintiff's suspension or in the purported statements about the suspension. While Plaintiff alleges that, after he was suspended, he wrote to President DeFleur complaining of what he felt was the Station's unconstitutional policy, *see* Compl. ¶ 24 & Ex. 7, the Supreme Court has held that the "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives ...." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

Plaintiff has failed to allege sufficient facts to establish that the Station's actions in drafting and enforcing its profanity and obscenity policy, or making statements about Plaintiff's suspension, were taken under color of state law. Without state action on the Station's part, the Section 1983 claims against this defendant are fatally flawed and the sought-after injunction cannot issue. More importantly, however, is the Court's current lack subject matter jurisdiction over this matter. With the dismissal of BU from this action and the determination that the Section 1983 claims against the Station are fatally flawed, the Court lacks subject matter jurisdiction over the matter. Therefore, the Court must *sua sponte* dismiss the action against the Station despite its non-appearance in this matter. *See Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. DuPont,* 565 F.3d 56, 62-63 (2d Cir.2009).[FN10]

> FN10. In *Durant, Nichols,* the Second Circuit wrote:
>
> "It is a fundamental precept that federal courts are courts of limited jurisdiction" and lack the power to disregard such limits as have been imposed by the Constitution or Congress. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d

274 (1978). If subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action *sua sponte. See, e.g., Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

565 F.3d at 62-63.

**V. CONCLUSION**

**\*10** For the reasons articulated above, SUNY BINGHAMTON's motion to dismiss the claims against it [dkt. # 7] is **GRANTED,** and all claims against SUNY BINGHAMTON are **DISMISSED.** Plaintiff's motion for a preliminary injunction [dkt. # 18] is **DENIED.** Further, the Court *sua sponte* **DISMISSES** the action against WHRW FM RADIO for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.
Dyno v. Binghamton
Slip Copy, 2009 WL 1663990 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3419954 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
Roy Den HOLLANDER, Plaintiff-Appellant,
v.
COPACABANA NIGHTCLUB, China Club, Lotus,
Sol, Jane Doe Promoters and A.E.R. Lounge,
Defendants-Appellees,
Guest House and A.E.R. Nightclub, Defendants.
**Docket No. 08-5547-cv.**

Argued: Aug. 24, 2009.
Decided: Sept. 1, 2010.

**Background:** Customer, individually and on behalf of
putative class of similarly situated men, brought § 1983
action against nightclub operators and promoters, alleging
that "Ladies Night" promotions, in which women were
charged discounted admission, constituted sex
discrimination in violation of the Equal Protection Clause
of the Fourteenth Amendment. The United States District
Court for the Southern District of New York, Cedarbaum,
J., 580 F.Supp.2d 335, granted operators' motion to
dismiss, and plaintiffs appealed.

**Holdings:** The Court of Appeals held that:
(1) state's liquor licensing laws did not cause nightclubs to
hold, or reduce their admission charges for women on,
"Ladies' Nights," as required to establish nightclubs'
actions were fairly attributable to the state, and
(2) state's issuance of liquor licenses to nightclubs,
standing alone, was insufficient basis to establish
nightclubs were "state actors" for purposes of § 1983
action.

Affirmed.

West Headnotes

[1] Federal Courts 170B ⚷ 776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial de novo. Most Cited
Cases
Court of Appeals reviews de novo a district court's
decision to grant a motion for judgment on the pleadings
pursuant to rule governing dismissal for failure to state a
claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[2] Civil Rights 78 ⚷ 1326(4)

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations,
in General
                    78k1326(4) k. In general. Most Cited
Cases
State action, for purposes of § 1983 action, occurs when
the challenged action of a private party is fairly
attributable to the state, which is achieved when a
two-prong test is met: first, the deprivation must be caused
by the exercise of some right or privilege created by the
State or by a rule of conduct imposed by the State or by a
person for whom the State is responsible; and second, the
party charged with the deprivation must be a person who
may fairly be said to be a state actor. 42 U.S.C.A. § 1983.

[3] Civil Rights 78 ⚷ 1326(4)

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations,
in General
                    78k1326(4) k. In general. Most Cited
Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3419954 (C.A.2 (N.Y.)))

Where a § 1983 defendant's official character is such as to lend the weight of the state to his decisions, the two prongs of the test for determining whether the action of a private party is fairly attributable to the state collapse into a single inquiry; but where the defendants are without such apparent authority, that is, they are private parties, the prongs diverge. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞    1396**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1396 k. Color of law; state action. Most Cited Cases
It is not enough for a plaintiff alleging a § 1983 violation to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞    1326(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(7) k. Public support, license, or regulation; utilities and monopolies. Most Cited Cases
State's liquor licensing laws did not cause nightclubs to hold, or reduce their admission charges for women on, "Ladies' Nights," as required to establish nightclubs' actions were fairly attributable to the state in § 1983 action alleging nightclubs' "Ladies' Night" policies violated male patrons' equal protection rights, since state's issuance of liquor licenses to nightclubs was not directly related to nightclubs' pricing schemes. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞    1326(4)**

78 Civil Rights
    78III Federal Remedies in General

        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(4) k. In general. Most Cited Cases

**Civil Rights 78 ☞    1326(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(5) k. Cooperation with state actor. Most Cited Cases
The actions of nominally private entities are attributable to the state for purposes of § 1983 when: (1) the entity acts pursuant to the coercive power of the state or is controlled by the state; (2) the entity has been delegated a public function by the state; or (3) the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞    1326(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(7) k. Public support, license, or regulation; utilities and monopolies. Most Cited Cases
State's issuance of liquor licenses to nightclubs, standing alone, was insufficient basis to establish nightclubs were "state actors" for purposes of § 1983 action alleging nightclubs' "Ladies Nights," wherein nightclubs reduced their admission charges for women, violated male patrons' equal protection rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Plaintiff-appellant Roy Den Hollander, individually and on behalf of a putative class of similarly situated men,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3419954 (C.A.2 (N.Y.)))

appeals the Rule 12(b)(6) dismissal of his Section 1983 action brought against several New York City nightclubs for discriminating against men on "Ladies' Nights." *See* Hollander v. Copacabana Nightclub, 580 F.Supp.2d 335 (S.D.N.Y.2008) ( Cedarbaum, J.).

Upon review, we agree with the district court that the Nightclubs were not state actors. Accordingly, we AFFIRM.Roy Den Hollander, New York, N.Y., for Plaintiff-Appellant.

Joseph Salvo, Gordon & Rees LLP, New York, N.Y. (Christopher B. Block, Thomas B. Coppola, on the brief), for Defendants-Appellees.

Before POOLER and WINTER, Circuit Judges, Judge MAUSKOPF[FN*], District Judge.

PER CURIAM:

*1 The facts of the case are straightforward. During "Ladies' Nights," several New York City nightclubs ("Nightclubs") charge males more for admission than females or give males less time than females to enter the Nightclubs for a reduced price or for free. Den Hollander, who was admitted to the Nightclubs under this admission regime, attributes these pernicious "Ladies' Nights" to "40 years of lobbying and intimidation, [by] the special interest group called 'Feminism' [which] has succeed in creating a customary practice ... of invidious discrimination of men." Den Hollander filed suit, on behalf of himself and others like him, alleging violation of his equal protection rights pursuant to 42 U.S.C. § 1983.

Den Hollander alleges that the Nightclubs engage in state action by selling alcohol on their premises under an extensive regulatory system. According to the amended complaint, the Nightclubs operate in New York and are licensed to sell alcohol on their premises. The New York Alcoholic Beverage Control Law (the "ABC Law") closely regulates the manufacture, sale, and distribution of alcoholic beverages in New York, and the New York State Liquor Authority (the "SLA") issues licenses in accordance with and oversees the implementation of the ABC Law.

The district court dismissed Den Hollander's Section 1983 claim after concluding that the Nightclubs were not state actors. Without action on our part, Den Hollander paints a picture of a bleak future, where "none other than what's left of the Wall Street Moguls" will be able to afford to attend Nightclubs. Because, however, we agree with the district court that Den Hollander has failed to sufficiently allege state action, we must affirm.

**I. Discussion**

[1] We review *de novo* a district court's decision to grant a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(b)(6). *Desiano v. Warner-Lambert & Co.,* 467 F.3d 85, 89 (2d Cir.2006). To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

[2] The only question before us is whether Den Hollander has adequately alleged that the Nightclubs' admission polices constituted state action. To assert a Section 1983 claim, Den Hollander must plead that the Nightclubs' conduct was done under the color of state law. *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (per curiam). State action "occurs where the challenged action of a private party is 'fairly attributable' to the state," *Logan v. Bennington Coll. Corp.,* 72 F.3d 1017, 1027 (2d Cir.1995) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)), which is achieved when a two-prong test is met:

*2 First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3419954 (C.A.2 (N.Y.)))

whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar,* 457 U.S. at 937, 102 S.Ct. 2744.

*1. Standard of Review*

Before applying this test to the allegations in the complaint, however, we must address Den Hollander's argument that in gender discrimination cases, state action can be established by a showing of a lesser degree of government involvement than in non-discrimination cases. He argues that because "constitutional scrutiny for sex discrimination approaches that for color discrimination," and "it follows that the state action determination in sex cases should also require a lesser degree of government involvement."

We find Den Hollander's pleadings so lacking that even under a lesser standard, he has failed to allege state action. Therefore, it is unnecessary for us to decide if a lesser standard is appropriate for gender discrimination cases. *See Weise v. Syracuse University,* 522 F.2d 397, 405 (2d Cir.1975).

*2. State Action*

[3] We analyze this case under both *Lugar* prongs, which are related, but not redundant. Where the defendant's "official character is such as to lend the weight of the state to his decisions," the two prongs collapse into a single inquiry. *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744. But where, as here, the defendants are "without such apparent authority, i.e., ... private part[ies]," the prongs diverge. *Id.*

[4] To prevail under either prong, Den Hollander must allege that the decision to adopt discriminatory admission fees and rules is fairly attributed to the state. We have made clear that a causal link between the harm and the state action is required: "[i]t is not enough ... for a plaintiff to plead state involvement in *some activity* of the institution alleged to have inflicted injury upon a plaintiff;

rather, the plaintiff must allege that the state was involved with the *activity that caused the injury* giving rise to the action." *Syblanski,* 546 F.3d at 257-58 (quotation marks omitted). Under both prongs, this requisite link is lacking.

[5] The causal connection is obviously missing under the first prong, which requires that the deprivation be caused by a privilege or right granted by the state. The alleged deprivation here is discriminatory admission prices, ("The deprivation is males paying more than females or investing more of their time to gain admission."), and the alleged grant by the state is the privilege to sell alcohol. The link Den Hollander suggests is too attenuated to be causal: he argues that the Nightclubs may only charge discriminatory prices because they sell alcohol-without the draw of alcohol, his argument goes, the Nightclubs would not be popular destinations and accordingly, would not be able to charge for admission. Regardless of the veracity of this statement, we cannot agree that the state's liquor licensing laws have caused the Nightclubs to hold "Ladies' Nights;" liquor licenses are not directly related to the pricing scheme.

*3 [6] To plead the second prong, Den Hollander must allege that the Nightclubs are state actors. The actions of nominally private entities are attributable to the state when those actions meet one of three tests: 1. The "compulsion test:" "the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state," 2. The "public function test:" "the entity 'has been delegated a public function by the [s]tate,' " or, 3. The "joint action test" or "close nexus test:" "the state provides '*significant encouragement*' to the entity, the entity is a 'willful participant in *joint activity* with the [s]tate,' or the entity's functions are '*entwined*' with state policies." *Sybalski,* 546 F.3d at 257(emphasis added) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citations and internal quotation marks omitted)).

[7] Den Hollander's amended complaint fails under all three tests because *Moose Lodge No. 107 v. Irvis* directly refutes that a liquor license by itself may form a basis for state action. 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). It is with great reluctance that we call attention to a case upholding the constitutionality of discrimination against African Americans, but until the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))
(Cite as: 2010 WL 3419954 (C.A.2 (N.Y.)))

Supreme Court revisits *Moose Lodge,* we are required to follow its holding. In *Moose Lodge,* the Supreme Court found no state action in race discrimination in the serving of food and beverages at a private club (i.e. a club only open to its members and their guests). The Supreme Court specifically held that a liquor license is insufficient to establish state action. Den Hollander alleges no basis for state action other than the Nightclubs' liquor licenses, therefore, his complaint is insufficient.

Accordingly we affirm the district court's dismissal of his Section 1983 action against the Nightclubs for gender discrimination.

FN* The Honorable Roslynn R. Mauskopf, United States District Court for the Eastern District of New York, sitting by designation.

C.A.2 (N.Y.),2010.
Hollander v. Copacabana Nightclub
--- F.3d ----, 2010 WL 3419954 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jody FABRIKANT & Russell A. Schindler, Plaintiffs,
v.
Christine FRENCH; William Deridder; Hector L.
Mejias, Jr.; John Spinato; Catherine Palmerwemp;
Walter Sasse; Christina Khuly; David Stark; Diane
Stark; Ulster County Society for the Prevention of
Cruelty to Animals; Bradley Knee; Avery Smith; &
Laraine Caliri, Defendants.
**No. 1:03-CV-1289-DNH-DRH.**

July 13, 2010.

**Background:** Animal owner and her former attorney
brought § 1983 action against not-for-profit animal
protection organization, its employees, and individuals
who provided information to organization, arising from
seizure of animals and owner's arrest and prosecution
on state charges of animal cruelty under New York law.
The District Court, Hurd, J., 328 F.Supp.2d 303,
dismissed complaint, and plaintiffs appealed. The Court
of Appeals, 232 Fed.Appx. 17, vacated and remanded.
Plaintiffs filed amended complaint and defendants
moved for summary judgment.

**Holdings:** The District Court, David N. Hurd, J., held
that:
(1) organization's employees had probable cause to
believe that owner had committed animal cruelty;
(2) defendants' performance of medical procedures on
seized animals was not conducted under color of state law;
and
(3) defendants' actions could not sustain First Amendment
retaliation claim.

Motion granted.

West Headnotes

**[1] Civil Rights 78 🔑 1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
In order to establish a constitutional claim under § 1983,
a plaintiff must show that the defendants were acting under
the color of state law at the time of the alleged violation
and that the action was a deprivation of a constitutional or
federal right. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 🔑 1325**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1325 k. State or territorial action, or
individual or private action, in general. Most Cited Cases
Defendant's misuse of power, possessed by virtue of state
law and made possible only because the wrongdoer is
clothed with the authority of state law, is action taken
"under color of state law," for purposes of § 1983 action.
42 U.S.C.A. § 1983.

**[3] Civil Rights 78 🔑 1088(5)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in
General
        78k1088 Police, Investigative, or Law
Enforcement Activities
            78k1088(5) k. Criminal prosecutions. Most
Cited Cases
In order to state a malicious prosecution claim under §
1983, the plaintiff must allege that: (1) the defendant
initiated a prosecution against the plaintiff, (2) the
defendant lacked probable cause to believe the proceeding
could succeed, (3) the defendant acted with malice, (4) the
prosecution was terminated in the plaintiff's favor, and (5)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 🔑 1088(5)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
          78k1088(5) k. Criminal prosecutions. Most Cited Cases
Animal owner satisfied first element of her § 1983 malicious prosecution claim against employees of not-for-profit animal protection organization, that employees initiated prosecution against her, by alleging that employees made false statements to law enforcement officials regarding her alleged animal cruelty. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 🔑 1088(5)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
          78k1088(5) k. Criminal prosecutions. Most Cited Cases
Although civilians who provide law enforcement with information in good faith will generally not be considered to have commenced a criminal prosecution, for purposes of malicious prosecution claim under § 1983, a citizen will nonetheless be deemed to have initiated criminal proceedings against a suspect if he or she instigated the arrest by being particularly insistent, or in some cases, providing false information to police. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 🔑 1088(5)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in

General
        78k1088 Police, Investigative, or Law Enforcement Activities
          78k1088(5) k. Criminal prosecutions. Most Cited Cases
Employees of not-for-profit animal protection organization had probable cause to believe that animal owner had committed animal cruelty under New York law, precluding owner's § 1983 claim for alleged malicious prosecution in violation of Fourth Amendment; video recording and photographs taken of owner's home during execution of search warrant showed that piles of feces and open garbage bags were left throughout residence and that animals were locked in small crates, there were other accounts of abuse, and owner admitted that she was having difficulty caring for dogs. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; N.Y.McKinney's Agriculture and Markets Law § 353.

**[7] Malicious Prosecution 249 🔑 15**

249 Malicious Prosecution
  249II Want of Probable Cause
      249k15 k. Necessity. Most Cited Cases
Existence of probable cause will defeat a malicious prosecution claim.

**[8] Arrest 35 🔑 63.4(2)**

35 Arrest
  35II On Criminal Charges
      35k63 Officers and Assistants, Arrest Without Warrant
        35k63.4 Probable or Reasonable Cause
          35k63.4(2) k. What constitutes such cause in general. Most Cited Cases
Probable cause exists when there is knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution that a crime was committed. U.S.C.A. Const.Amend. 4.

**[9] Civil Rights 78 🔑 1326(4)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
           78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(4) k. In general. Most Cited Cases

Actions of private, not-for-profit animal protection organization and its employees, in spaying, neutering, or amputating animals seized from owner's home, were not conducted under any New York statutory delegation, but rather in furtherance of organization's objectives and under organization's control, and thus owner could not show that organization and its employees acted under color of state law, as required to sustain her § 1983 due process claim. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ⟶ 1326(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
           78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(4) k. In general. Most Cited Cases

**Civil Rights 78 ⟶ 1326(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
           78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(5) k. Cooperation with state actor. Most Cited Cases

Private entity may be considered a state actor for purposes of a § 1983 claim when: (1) the entity acts pursuant to the coercive power of the state or is controlled by the state (the compulsion test); (2) the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies (the joint action

test or close nexus test); or (3) the entity has been delegated a public function by the states (the public function test). 42 U.S.C.A. § 1983.

**[11] Animals 28 ⟶ 3.5(11)**

28 Animals
    28k3.5 Regulation in General
        28k3.5(11) k. Animal welfare societies and agencies. Most Cited Cases

**Civil Rights 78 ⟶ 1326(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
           78k1326 Particular Cases and Contexts
                78k1326(3) Private Persons or Corporations, in General
                    78k1326(4) k. In general. Most Cited Cases

**Constitutional Law 92 ⟶ 1553**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
           92XVIII(A)3 Particular Issues and Applications in General
                92k1553 k. Retaliation. Most Cited Cases

Actions of private, not-for-profit animal protection organization and its employees, in seizing animals from owner's home, performing amputation on at least one animal, and prosecuting owner for animal cruelty, could not sustain owner's First Amendment free speech retaliation claim under § 1983; defendants were not acting under color of state law by amputating animals, but rather in furtherance of organization's goals, and defendants had probable cause to search owner's home, arrest her, seize animals, and initiate prosecution pursuant to New York law. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; N.Y.McKinney's Agriculture and Markets Law § 353.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

[12] Judgment 228 ⚷      828.8

228 Judgment
   228XVII Foreign Judgments
      228k828 Effect of Judgments of State Courts in
United States Courts
         228k828.8 k. Nature of state tribunal's
proceedings. Most Cited Cases

Judgment 228 ⚷      828.17(1)

228 Judgment
   228XVII Foreign Judgments
      228k828 Effect of Judgments of State Courts in
United States Courts
         228k828.17 Determination of Issues Involved
and Effect of Judgment
            228k828.17(1) k. In general. Most Cited
Cases
Animal owner was estopped in her § 1983 action from
relitigating issue of whether not-for-profit animal
protection organization violated her right to be free from
unreasonable searches or seizures in its execution of
search warrant at her home; in prior New York
prosecution for animal cruelty stemming from that search,
state judge denied owner's suppression motion on those
grounds. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983;
N.Y.McKinney's Agriculture and Markets Law § 353.
Kevin A. Luibrand, Esq., Luibrand Law Firm, PLLC,
Latham, NY, for Plaintiff.


Russell A. Schindler, Esq., Kingston, NY, pro se.


James A. Muscato II, Esq., Sue H.R. Adler, Esq., Dean S.
Sommer, Esq., Young, Sommer, Ward, Ritzenberg, Baker
& Moore, LLC, Albany, NY, for Defendants.


***MEMORANDUM-DECISION and ORDER***


DAVID N. HURD, District Judge.


**I. INTRODUCTION**

**\*1** Plaintiffs Jody Fabrikant and Russell A. Schindler,
Esq., *pro se,* filed their second amended complaint
following the reinstatement of their claims pursuant to the
mandate of the Second Circuit Court of Appeals, *see
Schindler v. French,* 232 Fed.Appx. 17, 19-20 (2d
Cir.2007). Fabrikant asserts, *inter alia,* that her federal
constitutional rights were violated during the course of her
criminal prosecution for animal cruelty, including her right
to be free from malicious prosecution *(Causes of Action
Two and Four),* her right to due process *(Cause of Action
Five),* her right to a presumption of innocence *(Cause of
Action Six),* her right to counsel *(Cause of Action Eight),*
her right to free speech *(Cause of Action Nine),* and her
right to be free from unreasonable searches and seizures
*(Cause of Action Ten).* She also asserts pendent state law
claims *(Causes of Action One, Three, Eleven, Twelve,
Thirteen, and Fourteen).* Finally, Fabrikant and Schindler
jointly assert a state law claim for libel *(Cause of Action
Seven).*


Defendants Christine French, William DeRidder, Hector
L. Mejias, Jr., John Spinato, Catherine Palmer-Wemp,
Walter Sasse, Christina Khuly, David Stark, Diane Stark,
Ulster County Society for the Prevention of Cruelty to
Animals ("UCSPCA"), Bradley Knee, Avery Smith, and
Larine Caliri (collectively "defendants") move for
summary judgment of all claims pursuant to Federal Rule
of Civil Procedure 56. Both plaintiffs oppose, but
Fabrikant withdraws her claims for the alleged violation of
her right to a presumption of innocence and legal counsel.
(Pl. Fabrikant's Opp'n Mem. of Law, Dkt. No. 178, 25.)
Accordingly, *Causes of Action Six and Eight* are not at
issue and will be dismissed. Defendants' summary
judgment motion was considered without oral argument.


**II. BACKGROUND**


This lawsuit arises from the investigation and subsequent
criminal prosecution of Fabrikant (hereinafter "plaintiff")
for alleged animal cruelty in violation of Section 353 of
New York's Agriculture and Markets Law. In or around
February 2002, plaintiff was in possession of fifteen
animals, including one Rottweiler, two Cocker Spaniels,
one Chow, one Basenji mix, nine Basenji/Great Pyrenees
puppies, and one cat. Complaints about the animals'

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

treatment were made to law enforcement authorities and defendant UCSPCA after several people, including defendants Khuly, David Stark, and Diane Stark, visited plaintiff's home in response to an advertisement placing the puppies for adoption.

In their capacities as UCSPCA Investigators, defendants Spinato and Sasse visited plaintiff's home to assess the validity of the complaints of animal cruelty. Having received several reports and made their own personal observations of the animals at plaintiff's home, they applied for a search warrant to seize the animals. The warrant was issued on March 1, 2002 and authorized the seizure of the nine puppies, the Rottweiler, the Chow, and any other evidence of animal cruelty found within the residence. Defendants Spinato, Sasse, DeRidder, and Palmer-Wemp executed the search warrant on March 2, 2002. As UCSPCA's Operations Manager and Veterinary Technician, respectively, defendants DeRidder and Palmer-Wemp were responsible for removing the animals from plaintiff's home and evaluating their overall health.

**\*2** Defendant Spinato arrested plaintiff during the execution of the warrant while defendants DeRidder and Palmer-Wemp seized the nine puppies, the Chow, the Rottweiler, one of the Cocker Spaniels, and the cat. Two of the remaining dogs were not seized because they appeared in adequate condition. After the house was secured, plaintiff was arraigned on animal cruelty charges, and the seized animals were taken to the UCSPCA for evaluation and medical treatment.

On March 6, 2002, a state court order was issued directing that the animals be allowed to remain at plaintiff's home during the pendency of the criminal charges. *(See* Ex. E to Pl. Fabrikant's Aff., Dkt. No. 179-6.) Notwithstanding the order, the seized animals remained in the care of the UCSPCA. During that time, UCSPCA's Executive Director, defendant French, sought foster homes for the nine puppies and the cat. She also ordered that the animals be spayed and neutered pursuant to UCSPCA's policy for animals leaving the shelter. While in foster care, one of the hind claws of one of the dogs was surgically removed due to an alleged infection.

Plaintiff was represented by her co-plaintiff, Mr.

Schindler, during her criminal case. She appeared in court on March 6 and 13, 2002 for pre-trial proceedings related to the criminal accusatory instruments. On March 26, 2002, she moved to dismiss the charges against her based upon alleged prosecutorial misconduct and the violation of her right to due process. The motion to dismiss was denied on May 2, 2002. She next appeared in court on October 24, 2002, at which time the prosecution orally moved to dismiss the charge of animal cruelty related to the Rottweiler. The judge agreed to dismiss the charge in the interest of justice, but the four other animal cruelty charges remained. Plaintiff's trial on those charges began on October 24, 2002; however, a mistrial was ordered on October 29, 2002 following prejudicial statements made during Mr. Schindler's opening statement. *(See* Order of Mistrial, Ex. U to Adler Dec., Dkt. No. 169-32, 2.)

Following the mistrial, plaintiff moved to dismiss all charges in the interest of justice on April 10, 2003 based upon alleged misconduct by law enforcement and UCSPCA personnel. A hearing was held on May 13, 2003 before a new presiding judge, Rochester Town Justice Ronald W. Keillor, Jr. A separate hearing was later held on May 27, 2003 in connection with plaintiff's suppression motion. Although plaintiff's motions were denied, she was acquitted after a second jury trial conducted on October 10 and 11, 2003.

### III. *DISCUSSION*

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. FED.R.CIV.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. FED. R. CIV. P. 56; *Liberty Lobby,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

*Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party. *Liberty Lobby, Inc.,* 477 U.S. at 248-49, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356.

**A. *Plaintiff's Federal Claims Pursuant to* 42 U.S.C. § 1983**

**\*3** [1][2] Plaintiff asserts one or more federal claims against each of the defendants pursuant to 42 U.S.C. § 1983 ("§ 1983") *(Causes of Action Two, Four, Five, Nine,* and Ten). In order to establish a constitutional claim under § 1983, plaintiff must show that the defendants were acting under color of state law at the time of the alleged violation and that the action was a deprivation of a constitutional or federal right. *Washington v. County of Rockland,* 373 F.3d 310, 315 (2d Cir.2004) (citing *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743-44 (2d Cir.2003)). A defendant's "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law," is action taken 'under color of state law.' " *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) (citations omitted).

**1. *Malicious Prosecution Claims***

[3] Plaintiff asserts federal claims for malicious prosecution in *Causes of Action Two* and *Four* against defendants Spinato, Khuly, Sasse, Diane Stark, Caliri, Smith, and Knee. In order to demonstrate a violation of her right to be free from malicious prosecution, she must raise an issue of fact as to five separate elements:

> (1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, [ ](4) that the prosecution was terminated in the plaintiff's favor ... [and] that there was (5) a sufficient post-arraignment liberty restraint to

implicate the plaintiff's Fourth Amendment rights.

*Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (citations omitted).[FN1]

[4][5] With respect to the first element, defendants Spinato and Sasse concede that they initiated a criminal prosecution against plaintiff due to their roles as authorized peace officers for defendant UCSPCA. In contrast, defendants Khuly, Diane Stark, Caliri, Smith, and Knee argue that there is no issue of fact as to whether they commenced the criminal prosecution against plaintiff because their involvement is undisputably limited to reporting their observations to law enforcement and UCSPCA personnel. Although civilians who provide law enforcement with information in good faith will generally not be considered to have commenced a criminal prosecution, *see Weintraub v. Bd. of Educ. of City of New York,* 423 F.Supp.2d 38, 55 (E.D.N.Y.2006); *Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 131 688 N.Y.S.2d 12, 15 (N.Y.App. Div. 1st Dep't 1999), a citizen will nonetheless be deemed to have initiated criminal proceedings against a suspect if he or she instigated the arrest by being particularly insistent, or in some cases, providing false information to police. *See Weintraub,* 423 F.Supp.2d at 55-56; *Fowler v. Robinson,* No. 94-CV-836, 1996 WL 67994, at *6 (N.D.N.Y. Feb. 15, 1996) (McAvoy, C.J.).

**\*4** Plaintiff disputes the veracity of the reports made by defendants and alleges that they instigated her arrest by providing false statements to law enforcement. By virtue of her co-habitation with the animals, plaintiff has personal knowledge of the conditions of the animals' treatment. Accordingly, she may rely upon her own statements to raise an issue of fact as to whether the defendants misled the police and the UCSPCA about her behavior. Whether defendants Khuly, Diane Stark, Caliri, Smith, and Knee in fact lied would require a factfinder to make several credibility determinations as between the defendants and plaintiff. Therefore, plaintiff has satisfied the first element of her malicious prosecution claims because she has raised an issue of fact which, if true, would tend to show that the defendants made false statements to law enforcement and UCSPCA personnel in an effort to encourage plaintiff's prosecution.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

[6][7][8] The second element of a malicious prosecution claim proves more difficult for plaintiff in light of the video recording and photographs taken of her home during the execution of the search warrant on March 2, 2002. (*See* Ex. K to Sasse Decl.; Ex. L to Sasse Decl.) The existence of probable cause will defeat a malicious prosecution claim. *Dickerson v. Napolitano,* 604 F.3d 732, 751 (2d Cir.2010) (citing *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006); *Burns v. City of N.Y.,* 17 A.D.3d 305, 305, 791 N.Y.S.2d 851, 851 (2d Dep't 2005)). Probable cause exists when there is " 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution' " that a crime was committed. *Dickerson,* 604 F.3d at 751 (quoting *Jaegly,* 439 F.3d at 152). Section 353 of New York's Agricultural and Markets Law prohibits, in pertinent part, "any act of cruelty to any animal," including the deprivation of "necessary sustenance, food or drink" and other unjustifiable injury. N.Y. AGRIC. & MKTS. LAW § 353. The review of the video recording and photographs of plaintiff's home indicates that defendants had probable cause to believe that she had committed acts of cruelty based upon the condition of the animals' living quarters. In particular, the evidence shows that piles of feces and open garbage bags were left throughout the residence. Additionally, the animals were found locked in small crates, and at least two of the animals were locked together in a single crate making it difficult for either of them to move or lie down. At a minimum, the video recording and photographs indicated severely unhealthy living conditions for the animals. Taken together with the other accounts of abuse and plaintiff's own admission that she was having difficulty caring for the dogs, there was probable cause to believe she had committed animal cruelty. Therefore, defendant's motion as to *Causes of Action Two* and *Four* will be granted, and consideration of the remaining elements for plaintiff's malicious prosecution claims is unnecessary.

### 2. *Due Process Claim*

**\*5** [9] Plaintiff alleges defendants French, DeRidder, UCSPCA, Caliri, Knee, and Smith violated her right to due process when her animals were spayed, neutered, and/or amputated after being seized from her home *(Cause of Action Five).* As a preliminary matter, defendants contend they did not act under color of state law as

required for a due process claim brought pursuant to § 1983.

[10] A private entity such as the UCSPCA may be considered a state actor when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the states," ("the public function test").

*Sybalski v. Indep. Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (alteration marks omitted) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (citations and internal quotation marks omitted)). In *Sybalski,* the Second Circuit considered whether the corporate owner of a group home for mentally disabled adults and five employees of the corporate entity were state actors under either the joint action or public function tests. 546 F.3d at 258-59. Ultimately, the court concluded the defendants were not state actors because the statutory regulations imposed upon the corporate entity did not circumvent the defendants' decision making authority, *id.* at 259, and there was insufficient evidence to conclude that care of the mentally disabled "was a function 'traditionally and 'exclusively' reserved by the state." *Id.* at 260 (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)).

Plaintiff contends that the UCSPCA and its employees were state actors because they were vested with authority under state law. Undisputably, several state statutes provided the UCSPCA and its two investigators, defendants Spinato and Sasse, with the power to apply for a search warrant, seize animals, and make an arrest. For example, New York's Criminal Procedure Law provides that "[o]fficers or agents of a duly incorporated society for the prevention of cruelty to animals" are among the groups of persons who shall have the powers of "peace officers."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

N.Y.CRIM. PROC. LAW § 2.10(7). Further, the state's Agriculture and Markets Law authorizes, inter alia, any agent or officer of a duly incorporated society for the prevention of cruelty to animals to issue appearance tickets, make an arrest, or interfere to prevent any act of cruelty upon any animal. N.Y. AGRIC. & MKTS. LAW § 371. Similarly, New York's Not-for-Profit Corporation Law bestows "[s]pecial powers" onto a society for the prevention of cruelty to animals, including the filing of a criminal complaint and assisting in the presentation of evidence to tribunals. N.Y. NOT-FOR-PROFIT CORP. LAWWW § 1403(b)(2).

**\*6** Although such statutes are relevant to the state actor analysis for claims arising from the execution of the search warrant and the filing of criminal charges, plaintiff's due process claim is based upon only the spaying, neutering, and/or amputation of her animals. (*See* Pl. Fabrikant's Second Am. Compl., Dkt. No. 85, ¶¶ 154-57.) Plaintiff has not come forward with evidence suggesting that the medical attention administered by the UCSPCA and its employees, including the spaying, neutering, and/or amputation of plaintiff's animals from which *Cause of Action Five* arises, was authorized by state law. To the contrary, the defendants performed the medical procedures in furtherance of the UCSPCA's objectives and under the UCSPCA's control rather than under some statutory delegation of authority. Accordingly, the conduct alleged in plaintiff's due process claim brought under § 1983 was not carried out under color of law, and defendants' motion for summary judgment of *Cause of Action Five* will be granted.

### 3. *First Amendment Claim*

[11] Plaintiff also asserts under § 1983 that defendants French, DeRidder, Mejias, Spinato, Sasse, and UCSPCA retaliated against her in violation of her First Amendment right to free speech *(Cause of Action Nine)*. She alleges the defendants unlawfully seized her animals, performed an amputation, and prosecuted her for animal cruelty in retaliation for her speech related to the promotion of animal rights groups, the defense of the criminal allegations against her, and her refusal to cooperate with the investigation of another animal owner. *(See* Pl. Fabrikant's Second Am. Compl., Dkt. No. 85, ¶¶ 175, 178.)

[12] For the same reasons as with plaintiff's due process claim, plaintiff's allegations related to the spaying, neutering, and/or amputation performed on one or more of her animals does not give rise to a federal claim under § 1983 because none of those actions were under color of state law. Although defendants concede that the remaining allegations within *Cause of Action Nine,* i.e., the execution of the search warrant, the seizure of plaintiff's animals, and the filing of criminal charges, were state actions, the underlying motive for their conduct may not be called into question if there was probable cause to search plaintiff's home, arrest her, and prosecute her for animal cruelty. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (citing *Mozzochi v. Borden,* 959 F.2d 1174, 1179-80 (2d Cir.1992)). Having denied plaintiff's suppression motion in state court, Judge Babcock already determined that the search warrant was supported by probable cause, and plaintiff is barred from relitigating this issue while prosecuting her federal constitutional claims under § 1983 in federal court. *See Allen v. McCurry,* 449 U.S. 90, 104, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980) ("There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all."). Additionally, as already discussed in consideration of plaintiff's malicious prosecution claims, there was probable cause to arrest plaintiff in light of the animals' living conditions reflected by the video recording and photographs of her home on the day the search warrant was executed. Finally, plaintiff offers no opposition to defendants' argument with respect to her free speech claim despite being granted permission to submit a memorandum of law in excess of the traditional twenty-five pages afforded litigants under N.D.N.Y. Local Rule 7.1(c). *(See* Order, Dkt. No. 174.[FN2]) For all of these reasons, defendants' motion for summary judgment of plaintiff's free speech claim will be granted, and *Cause of Action Nine* will be dismissed.

### 4. *Unreasonable Search and Seizure Claim*

**\*7** Plaintiff also asserts that defendants Nace, DeRidder, Spinato, Sasse, and PalmerWemp violated her Fourth Amendment right to be free from unreasonable searches

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

and seizures when they executed the search warrant for her home and arrested her on March 2, 2002 *(Cause of Action Ten).* For the same reasons that plaintiff is estopped from relitigating the probable cause issue with respect to her First Amendment claim, she is also prevented from disturbing the state court's determination that the search warrant was supported by probable cause. *See Allen,* 449 U.S. at 104, 101 S.Ct. at 420. Additionally, the determination that defendants had probable cause to arrest her is fatal to her claim for false arrest. Therefore, defendants' motion for summary judgment of plaintiff's Fourth Amendment claim will be granted, and *Cause of Action Ten* will be dismissed.

**B. *The Remaining State Law Claims***

In light of the decision to dismiss the federal causes of action, the exercise of supplemental jurisdiction over plaintiff's remaining state law claims *(Causes of Action One, Three, Eleven, Twelve, Thirteen* and *Fourteen)* and the state law libel claim filed by both plaintiff and Mr. Schindler *(Cause of Action Seven)* is declined.

**IV. *CONCLUSION***

Summary judgment of plaintiff's federal claims is warranted for two separate reasons. First, none of the conduct apart from the application for the search warrant, seizure of plaintiff's animals, and subsequent criminal prosecution occurred under color of state law. Although the UCSPCA and its employees are infused with some level of authority under New York law, the relevant statutes did not authorize the spaying, neutering, and/or amputation of any of plaintiff's animals. Instead, these actions occurred under the discretion of the UCSPCA and its employees, and therefore, cannot form the basis of plaintiff's § 1983 claims. Second, the existence of probable cause insulates the defendants from liability for their decisions to seize plaintiff's animals, arrest her, and commence criminal proceedings. Even though plaintiff raises an issue of fact as to whether some of the defendants made false statements to investigators, the video recording and photographs of her home demonstrate that the defendants had probable cause to believe she had violated New York's Agriculture and Markets Law.

Accordingly, it is

ORDERED that

(1) Defendants' motion for summary judgment of the federal claims asserted under *Causes of Action Two, Four, Five, Six, Eight, Nine,* and Ten is GRANTED and these claims are DISMISSED with prejudice;

Defendants' motion for summary judgment of the state law claims asserted under *Causes of Action One, Three, Seven, Eleven, Twelve, Thirteen,* and *Fourteen* is GRANTED and these claims are DISMISSED without prejudice to allow plaintiffs to re-plead such claims in the appropriate state court; and

The Clerk of the Court is directed to enter a judgment accordingly.

**\*8** IT IS SO ORDERED.

FN1. In New York, a state law claim for malicious prosecution will survive summary judgment so long as there is proof of the same first four elements as for a federal claim under § 1983; that is, the elements are the same under New York law but for the requirement for federal claims that a plaintiff suffered a post-arraignment liberty restraint. *See Rohman,* 215 F.3d at 215 (citing *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999)).

FN2. Although plaintiff sought and was granted permission to file a fifty page memorandum of law, her brief totaled thirty-seven pages and failed to address defendants' arguments with respect to her ninth cause of action.

N.D.N.Y.,2010.
Fabrikant v. French
--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2774043 (N.D.N.Y.)
(Cite as: 2010 WL 2774043 (N.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.